UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| CROWN CASTLE FIBER LLC,<br>8020 Katy Freeway<br>Houston, Texas 77024<br><br>          Plaintiff,<br><br>                    v.<br><br>THE MAYOR and CITY COUNCIL of<br>OCEAN CITY,<br>301 N. Baltimore Avenue (3rd St)<br>Ocean City, MD 21842<br><br>          Defendant. | Case No.: 21-cv-3070 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND EXPEDITED TREATMENT**

For its Complaint against Defendant The Mayor and City Council of Ocean City ("Ocean City" or "Town"), Plaintiff Crown Castle Fiber LLC ("Crown Castle"), by its undersigned counsel, alleges, upon knowledge as to its own actions and upon information and belief as to all other matters, as follows:

**<u>NATURE OF THE ACTION</u>**

This case involves Ocean City's unlawful denial of Crown Castle's applications to install telecommunications services equipment in the public rights of way on three new street light poles in an area of the Town zoned Mobile Home Residential (MH) (the "Three MH Nodes"). Crown Castle has attempted to work cooperatively with the Town for several years to obtain approval for Crown Castle to deploy necessary advanced telecommunications facilities to serve residential areas of the Town. Indeed, Crown Castle has identified a specific need for wireless

1

service in the area around the proposed Three MH Nodes, and made numerous proposals and attempts to remedy that need.  Although Crown Castle presented evidence of this need for service in the vicinity of the Three MH Nodes, the Town's Mayor and City Council,[1] responding to the general opposition to wireless technology expressed by vocal residents, denied the Three MH Nodes via Resolution adopted and effective November 1, 2021.  Following its investigation and due diligence, Crown Castle had determined that there are no viable or less intrusive alternative structures or locations to locate its facilities to provide service in this area.

The Town's denial was not supported by substantial evidence contained in the written record and the denial effectively prohibits the provision of telecommunications services and personal wireless services in the vicinity of the proposed Three MH Nodes.  The prohibition is in violation of, and preempted by, Sections 253 and 332(c)(7)(B)(i)(II) of the federal Communications Act, 47 U.S.C. § 253, and 47 U.S.C. § 332(c)(7)(B)(i)(II).  The fact that the denial is not supported by substantial evidence in the written record violates Section 332(c)(7)(B)(iii).  47 U.S.C. § 332(c)(7)(B)(iii).  Ultimately, the Town's denial is unreasonable and unjustified, and therefore the Town unreasonably withheld its approval in breach of the Right-of-Way Use Agreement ("Use Agreement") between the parties.

## PARTIES

1.      Plaintiff Crown Castle is a limited liability company organized under the laws of the state of New York, with its principal place of business at 8020 Katy Freeway, Houston, Texas 77024.

2.      Crown Castle offers and provides telecommunications services in Maryland pursuant to a certificate of public convenience and necessity granted by the Maryland Public

---

[1] Although Ocean City is a Town under Maryland law, its governing body is called the Mayor and "City" Council.

Service Commission ("PSC").  In Maryland, Crown Castle Fiber LLC is authorized to provide resold and facilities-based local exchange and interexchange telecommunications services pursuant to orders granted in ML #s 154491 and 155464, TE-11292.  The authority was originally granted in the name of Sidera Networks, LLC ("Sidera") on June 18, 2014.  Sidera subsequently changed its name to Lightower Fiber Networks II, LLC ("Lightower") on October 1, 2014.  Crown Castle International Corp., through several indirect subsidiaries, acquired Lightower on November 1, 2017.  Lightower's existence remained unchanged, however, other than a change of its ultimate parent entity.  Lightower subsequently changed its name to Crown Castle Fiber LLC on May 16, 2018.  On June 27, 2018, the company notified the Maryland PSC of its name change to Crown Castle Fiber LLC.  Thus, Crown Castle is the entity granted authority to provide resold and facilities-based local exchange and interexchange telecommunications services in ML #s 154491 and 155464, TE-11292 in Maryland.

3.      Defendant the Mayor and City Council of Ocean City is the public body corporate empowered under Maryland law and the Charter of the Town of Ocean City to operate the Town, including the power to sue and be sued.  There are seven council members elected at large to staggered 4-year terms, and a Mayor elected at large every 2 years.  The Mayor and City Council's address is 301 N. Baltimore Avenue (3rd St), Ocean City, MD 21842.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because of the existence of a federal question arising under the Communications Act of 1934, as amended by the Telecommunications Act of 1996 (collectively the "Communications Act").  This Court has authority to issue declaratory judgment relief pursuant to 28 U.S.C. § 2201(a).

5.     The Court also has jurisdiction over Crown Castle's Sections 332(c)(7)(B)(i)(II), (iii), and (iv) claims under 47 U.S.C. § 332(c)(7)(B)(v).

6.     The Court has supplemental jurisdiction over Crown Castle's claims under Maryland law pursuant to 28 U.S.C. § 1367 because the Maryland claims are so related to claims in the action within the original jurisdiction that they form part of the same case or controversy.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to this action occurred in Maryland.

## FEDERAL TELECOMMUNICATIONS LAW

8.     In 1996, Congress amended the federal Communications Act of 1934 by enacting the Telecommunications Act of 1996 ("1996 Act").  The 1996 Act was expansive legislation intended to increase and improve competition in the telecommunications industry.  An important purpose of the 1996 Act was to "accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition . . . ."  H.R. Conf. Rep. No. 458, 104th Cong., 2d Sess. 1 (1996).

9.     When it enacted the 1996 Act, Congress considered the potential conflict between state and local government regulation of the public rights of way and the national need for deployment of advanced telecommunications and information technologies.  Accordingly, the 1996 Act created Section 253 of the Communications Act, which prohibits local entities from erecting barriers that may prohibit or may have the effect of prohibiting the ability of any entity to provide telecommunications services.  47 U.S.C. § 253(a).  Section 253(c) reserves local authorities' power to "manage" telecommunications providers' use of public rights of way, but

such management is limited to control over physical construction issues, and the regulation must be competitively neutral and non-discriminatory.  47 U.S.C. § 253(c).

10.     Similarly, in Section 332(c)(7)(B) of the Communications Act, Congress set forth specific procedural and substantive limits on the authority of local governments to regulate the deployment of personal wireless service facilities.  For example, if a local government wants to deny an application for a wireless facility, the denial must be supported by substantial evidence in the written record, and the local government must issue a written decision articulating the reasons for the denial.  47 U.S.C. § 332(c)(7)(B)(iii).  In addition, even if a denial is supported by substantial evidence, the denial cannot have the effect of prohibiting the provision of personal wireless services.  47 U.S.C. § 332(c)(7)(B)(i)(II).  Moreover, no denial can be based on the environmental effects of radio frequency ("RF") emissions, including fears regarding health effects, as long as the proposed facilities comply with the FCC's regulations concerning RF emissions.

11.     In 2018, the Federal Communications Commission ("FCC") clarified the appropriate standard to be used to determine when a local government action or requirement violates the effective prohibition clauses of Section 253 and Section 332(c)(7).  The FCC clarified that under Sections 253 and 332(c)(7) "an effective prohibition [of service] occurs where a state or local legal requirement materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service."  *In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 FCC Rcd 9088, ¶ 37, 2018 WL 4678555 (2018) ("*Declaratory Ruling*"), *aff'd*, *City of Portland v. U.S.*, 969 F.3d 1020 (9th Cir. 2020), *cert. denied*, 2021 U.S. Lexis 3538 (U.S. June 28, 2021).  The FCC clarified that "a state or local legal requirement could materially inhibit service in numerous

ways – not only by rendering a service provider unable to provide an existing service in a new geographic area or by restricting the entry of a new provider in providing service in a particular area, but also by materially inhibiting the introduction of new services or the improvement of existing services." *Id.*

12.    The FCC explained that an effective prohibition is not limited to deployment in areas with a gap in wireless coverage, "but also when densifying a wireless network, introducing new services or otherwise improving service capabilities." *Id.*

13.    The FCC also explained that "[t]o limit Sections 253(a) and 332(c)(7)(B)(i)(ii) to protecting only against coverage gaps or the like would be to ignore Congress's contemporaneously-expressed goals" to promote competition, provide higher quality services for telecommunications consumers, and encourage the rapid deployment of new telecommunications technologies. *Id.* at ¶ 38.

14.    The FCC also rejected prior court opinions that applied only a coverage gap-based analysis stating those opinions "reflect both an unduly narrow reading of the statute and an outdated view of the marketplace."  In contrast to the traditional wireless towers that provided services, "the current wireless marketplace is characterized by a wide variety of offerings with differing service characteristics and deployment strategies… [including to] accommodate increased in-building use of wireless services, necessitating deployment of small cells in order to ensure quality service to wireless callers within such buildings." *Id.* at ¶ 40.

15.    The FCC's determination that "a state or local legal requirement constitutes an effective prohibition if it materially limits or inhibits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment … applies equally to fees and non-fee legal requirements."  *Id.* at ¶ 82.

16.     The FCC stated that such non-fee legal requirements include aesthetic requirements.  *Id.* at ¶ 35.  To be valid, aesthetic requirements must be reasonable, which includes being technologically feasible.  *Id.* at ¶ 87; *City of Portland*, 969 F.3d 1020 (9th Cir. 2020).

17.     Additionally, the FCC stated that local requirements that all infrastructure be deployed below ground "would amount to an effective prohibition given the propagation characteristics of wireless signals" but a requirement can be considered to materially inhibit wireless service even if it does not require all wireless facilities to be deployed underground.  *Id.* at ¶ 90 (citing *Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571, 580 (9th Cir. 2008) (en banc)); *see also City of Portland*, 969 F.3d 1020 (the discussion of undergrounding in paragraph 90 was not challenged).

## STATEMENT OF FACTS

### Crown Castle's Telecommunications Service

18.     Crown Castle provides telecommunications services, as that term is defined by the Communications Act, 47 U.S.C. § 153(53).

19.     Crown Castle installs and operates telecommunications facilities to provide telecommunications services.

20.     Crown Castle's telecommunications services consist of providing transport of Crown Castle's customers' communications (both voice and data) between points designated by the customer without alteration of the content of the communications.

21.     Crown Castle provides different types of telecommunications services.  In this case, Crown Castle would provide a type of telecommunications service it calls radio frequency transport ("RF Transport") service.  Crown Castle's RF Transport customers are typically providers of retail wireless telecommunications services (also known as Commercial Mobile

7

Radio Services ("CMRS") providers, cellular, or Personal Communications Services ("PCS") providers).

22.     Using the Three MH Nodes it seeks to deploy in the Town, Crown Castle would provide telecommunications services to its wireless carrier-customers who would then integrate Crown Castle's services and network into the wireless carrier-customers' provision of personal wireless services to the residents of the Town.

23.     Ultimately, Crown Castle is not limited to providing telecommunications services to any specific type of customer.

24.     Crown Castle's RF Transport service offering involves a communication signal handed off from Crown Castle's customer.  This handoff and transport takes place at and through equipment configurations called "Nodes" that are located on utility or streetlight poles located in the public rights of way.

25.     The typical Node in Crown Castle's network consists of electronic equipment that converts RF format communications to light signals carried over fiber optic lines.  The equipment comprising a typical Node in Crown Castle's network includes a small, low-power antenna, laser, and amplifier equipment for the conversion of RF signals to optical signals (or from optical to RF).  Those items are connected to the antenna, fiber optic lines, and associated equipment (such as power supplies).

26.     When Crown Castle deploys small wireless facility Nodes, the service it provides to wireless carrier-customers supports those wireless carriers' provision of personal wireless services, as that term is defined in 47 U.S.C. § 332(c)(7)(C)(i).

27.     The effective coverage area of one of Crown Castle's Nodes is a radius of approximately 300 feet, depending on the conditions and surroundings.  Items such as buildings and trees interfere with the transmission of radio signals and can decrease the coverage distance.

28.     Accordingly, the specific location of each Node is carefully identified based on multiple parameters, including the other wireless facilities in potential wireless carrier-customers' networks, and, as a result, the Nodes cannot easily be moved or changed without significantly impacting the other Nodes in Crown Castle's network as well as the other facilities in Crown Castle's wireless carrier-customers' networks.

29.     The limited range of Crown Castle's Nodes, and similar small wireless facilities, in addition to being the function of the technology, serves a purpose.  Historically, deployment of wireless networks provided wider coverage, but had limited capacity (capacity being the ability to provide more people service and accommodate greater use of the limited wireless bandwidth).  Crown Castle's Nodes are part of a critical deployment of facilities to increase the coverage and capacity of existing wireless networks.  This deployment is often referred to as the "densification" of wireless networks, and it is necessary to the provision of personal wireless services by Crown Castle's wireless carrier-customers.  *See, e.g., Declaratory Ruling*, at ¶ 37.

30.     Although some of Crown Castle's services and network incorporate wireless reception devices, Crown Castle is not a wireless or commercial mobile radio service ("CMRS") provider.

31.     All of the wireless transmissions are controlled and made by Crown Castle's wireless carrier-customers, who control and are responsible for their licensed spectrum.

32.     Crown Castle needs to construct its telecommunications facilities in the public rights of way in the Town so that such services are available to residential areas of the Town.

33.     In order to construct its networks and facilities and therefore provide telecommunications services, Crown Castle must have access to the public rights of way in which to install and modify its equipment.

**Crown Castle's Attempts to Deploy Telecommunications Facilities in the Town**

34.     This case focuses on Crown Castle's applications to deploy the Three MH Nodes in an area of the Town known as Montego Bay.

35.     However, Crown Castle has been working cooperatively with the Town for approximately five years in an on-going attempt to deploy needed small wireless facilities in the Town.

36.     Beginning in 2016, Crown Castle began its outreach to the Town to identify the appropriate Town processes and requirements for Crown Castle to obtain approval to construct its telecommunications network.

37.     On February 15, 2017, Crown Castle and the Mayor and City Council entered into the Right of Way Use Agreement setting forth the terms governing Crown Castle's deployment of its telecommunications network in the Town.  A copy of the Use Agreement is attached hereto as Exhibit 1.  When executed, the Use Agreement was in the name "Crown Castle NG Atlantic LLC," which included its "lawful successors, assigns, and transferees," but Crown Castle NG Atlantic LLC was merged into Crown Castle Fiber LLC effective 11:59 pm on December 31, 2018.

38.     In accordance with the process communicated by the Town to Crown Castle, when Crown Castle wishes to deploy small wireless facilities, it first submits a request to the Mayor and City Council, showing the proposed locations and designs of the Nodes, including information such as photo-simulations to allow the Mayor and City Council to see what the

installations would look like.  Historically, only if the Mayor and City Council approved the proposed location and design was Crown Castle permitted to move to the next stage and apply for a permit and "Utility Installation Agreement" from the Town's Department of Public Works. The Utility Installation Agreement is the permitting mechanism used by the Town for utilities deploying lines or other facilities in the public rights of way.  Pursuant to the Use Agreement and the process set forth by the Town, Crown Castle has previously submitted requests to the Mayor and City Council and received approval for construction of telecommunications facilities in some areas of the Town.

39.     Despite being authorized by the Town to deploy small wireless facilities in certain areas of the Town, Crown Castle has sought for many years to obtain approval to install needed small wireless facilities in the Montego Bay area.

40.     Despite Crown Castle's attempts to work closely with Town officials and staff and to address any concerns or issues raised by the Town and residents, the Town has demonstrated an unwillingness to approve small wireless facilities in the Montego Bay MH zone.

41.     After unsuccessful requests in 2019 to obtain approvals for up to nine nodes in the Montego Bay MH zone, on March 9, 2021, Crown Castle submitted a request for approval for the Three MH Nodes in the area of Montego Bay most in need of telecommunications services.

42.     Pursuant to the Town's "Distributed Cellular Antenna System (DAS) Requirements modified January 10, 2017" (the "Town Antenna Requirements"), new poles or antenna equipment are prohibited in MH zones with certain limited exceptions, all of which require specific approval of the Mayor and City Council.

43.     The locations requested for the Three MH Nodes are at approximately 354 South Ocean Drive, 243 South Ocean Drive, and 167 South Ocean Drive.

11

44.     The existing utilities in each of those locations, and the Montego Bay area generally, are all underground.  Accordingly, there are no existing utility poles located in the public rights of way in the vicinity of the proposed location for the Three MH Nodes.

45.     In addition, there are no existing light poles in the public rights of way in the vicinity of the proposed locations for the Three MH Nodes.

46.     In each location for the Three MH Nodes, Crown Castle proposed to install small wireless facilities integrated into a new street light pole that Crown Castle would install, own, and maintain.

47.     The proposed street light poles with small wireless facilities would measure approximately 37 feet 10 inches tall for the Nodes at 243 South Ocean Drive and 167 South Ocean Drive, and approximately 33 feet 10 inches tall for the Node at 354 South Ocean Drive.

48.     As noted in the Agenda Packet for the March 9, 2021 Mayor and City Council meeting, Crown Castle had previously requested approval for each of the Three MH Node locations.

49.     Crown Castle's request for approval of the Three MH Nodes was submitted around the same time as a request for three Nodes in the Town's "R-1" zone.

50.     As reflected in the Minutes of the March 9, 2021 meeting, all of Crown Castle's proposed node locations were tabled and rescheduled for the March 30, 2021 meeting of the Mayor and City Council.

51.     On March 30, 2021, Crown Castle again presented to the Mayor and City Council a request for approval of the Three MH Nodes, as well as the three Nodes in the R-1 zone.

52.     The Agenda Packet for the March 30, 2021 meeting again noted that Crown Castle had previously requested approval for the Three MH Nodes.

53.     In the Agenda Packets for the Mayor and City Council meetings on March 9, 2021 and March 30, 2021, the City Engineer recommended that "[e]xisting height restrictions, existing underground utilities and the lack of existing tall street lights in the Montego Bay Neighborhood MAY provide justification for denial of those 3 locations."

54.     At the March 30, 2021 meeting, the Town heard comments from the public both in opposition to and in favor of Crown Castle's proposed nodes.

55.     One Councilmember characterized the opposition to the Three MH Nodes as emotional and impermissible health related objections.

56.     The resident testimony in support, on the other hand, cited a need for connectivity in the Montego Bay area.  Indeed, both resident speakers in support of the Three MH Nodes cited multiple surveys conducted in the community that indicate the majority of the Montego Bay homeowners were in favor of adding small wireless facilities in the rights of way to provide much needed connectivity.

57.     At the March 30, 2021 meeting, Crown Castle presented evidence in support of the approval of the Three MH Nodes.  Specifically, Crown Castle explained that this request had been pared down from the original nine locations in the Montego Bay area to limit the potential impact, if any, by limiting it to the three locations that have the most need.  Crown Castle presented testimony of its Senior RF Engineer to explain the need identified in the vicinity of the proposed Three MH Nodes.

58.     Following Crown Castle's presentation, the Mayor and City Council engaged in a lengthy discussion of the Three MH Nodes, including asking numerous questions of Crown Castle's representatives.

13

59.     At the end of the discussion, the Town voted to deny the Three MH Nodes "due to Montego Bay being a community of unique character, the importance of aesthetics to the community, no above-ground utilities exist in the community and the community has a 15' height restriction."

60.     The Town did not subsequently provide Crown Castle with a written denial of the Three MH Nodes following the March 30, 2021 meeting.

61.     After the March 30 meeting, the Town informed Crown Castle that it could submit a formal application using the Town's "Utility Installation Agreement (UA) for Private Utilities in Rights of Ways & Public Easements" application form (the "UA Application"), for the Three MH Nodes.

62.     This position taken by the Town was a break from its long-standing policy that the Town would not accept permit applications after an initial denial by the Mayor and City Council of a proposed node location.

63.     Since the Town invited it to do so, while acknowledging the potential dispute between the parties regarding whether an application subsequent to an unwritten denial was consistent with the Town's practice and Crown Castle's obligation, by letter dated June 8, 2021, Crown Castle agreed to submit formal applications for the Three MH Nodes within 60 days of the date of the June 8, 2021 letter. *See* Exhibit **2.** As long as the Town acted on the formal UA Applications within 90 days of submission pursuant to the FCC's shot-clocks, Crown Castle agreed to waive any claim that the Town had failed to timely act or failed to provide a decision in writing on its original March 9, 2021 request for approval of the Three MH Nodes.

64.     In accordance with the agreement reflected in its June 8, 2021 letter, Crown Castle submitted formal applications for the Three MH Nodes using the Town's UA Application form on August 6, 2021.

65.     Crown Castle's UA Application submissions included all required elements of the UA Application form.

66.     Crown Castle's UA Application submission included additional information regarding the RF need for the proposed Three MH Nodes, as well as technical construction drawings for the Three MH nodes, and photo-simulations depicting what the Three MH Nodes would look like when constructed.

67.     On September 8, 2021, the Town Engineer advised Crown Castle via letter that "new poles or antenna equipment located in R-1 or MH zoned neighborhoods are prohibited unless specifically approved by the Mayor and City Council of Ocean City."

68.     The Town Engineer's September 8, 2021 letter also included the Town's "Distributed Cellular Antenna System (DAS) Requirements modified January 10, 2017," (the "Town Antenna Requirements") listing the requirements for approval of a wireless facility to be installed in the public rights of way in the Town.  Those requirements indicated that in MH zones with underground utilities, like the Montego Bay area, "no new poles or antenna equipment [are] allowed," with the exception that "[n]ew poles or antenna equipment may be installed in designated 'technology gardens.'  Location and regulation of these gardens will be negotiated with the respective community association and the Mayor and City Council."

69.     Nothing in the UA Application, the Town Antenna Requirements, nor the Town Code require an applicant to demonstrate that a proposed wireless facility will fill a specific RF

15

need, is necessary to prevent an effective prohibition of service, or is the only viable (or least intrusive) alternative available.

70.     On October 7, 2021, the City Engineer advised Crown Castle that the applications for the Three MH Nodes would be presented to the Mayor and City Council on October 26, 2021.

71.     Prior to the October 26, 2021 meeting, a community group submitted a letter and petition in opposition to the proposed Three MH Nodes in Montego Bay.  The letter expressed the hope that these residents' response would be "***effective in prohibiting*** utility lampposts and ***5G equipment*** in [their] community," and noted that "you have at least 1,000 cheerleaders in the Montego Bay community behind ***your stealth position to prohibit 5G in residential neighborhoods***." (Emphasis added).

72.     Like the community opposition letter, the opposition petition also represents generalized objections to ***any*** 5G or wireless facilities in Montego Bay, with the clear goal being the prohibition of wireless facilities in that area of the Town.  Specifically, the petition states "[w]e the undersigned reject 5G in our community by way of cell towers or lampposts."

73.     In addition, the petition makes clear that the opposition is largely motivated by fears related to RF emissions, stating as justification for opposing the Three MH Nodes, "[n]o noxious or offensive trade or activity shall be carried out on any lot or upon the common areas or any other party of the property."

74.     In advance of the October 26, 2021 Mayor and City Council meeting, the City staff created its report, dated October 20, 2021 (the "Staff Report"), with staff's recommendation that the Mayor and City Council deny the Three MH Nodes.  *See* Exhibit 3.

75.     The Staff Report states that the "MH Zoning District has a maximum building height of 15' (Code Section 110-426)."

76.     The 15 foot height restriction in Section 110-426 of the Town Code applies to buildings in mobile home subdivisions.  It is not applicable to light poles or utility poles in the public rights of way.  *See* Town Code § 110-902.

77.     Indeed, there are some light poles in the public rights of way in the Montego Bay area that are taller than 15 feet, though none are in the vicinity of the Three MH Node locations.

78.     The Staff Report states that "no new poles or antenna equipment are allowed in MH districts except in designated 'technology gardens,' the location and regulation of which are negotiated with the respective community association and the Mayor and City Council."

79.     The Staff Report states that "Staff has received no correspondence from the Montego Bay Civic Association to indicate they support these proposed locations, and no technology garden location has been negotiated."

80.     The Staff Report noted that the applications were reviewed by the Town's consultant, CTC Technology and Energy ("CTC"), and that "CTC's report" addresses "whether Crown Castle has shown that the City is required to approve the proposed facilities."

81.     The CTC report presented CTC's view and opinion on the legal standard for demonstrating an "effective prohibition" of personal wireless service under Section 332(c)(7)(B)(i)(II) of the Communications Act.  The Staff Report summarized CTC's opinion on that issue.

82.     Nothing in the Town's application requirements, the Town Antenna Requirements, nor the Town Code demand that an applicant demonstrate any specific technical

metrics showing a need for service.  Nor do they require an applicant to demonstrate that a denial of an application will amount to an effective prohibition of service.

83.     The CTC report's opinions and assertions are inconsistent with, and attempt to impose requirements that are not imposed by, the Town's Code, the Town Antenna Requirements, and the Town's application requirements.

84.     The Staff Report noted that the petition in opposition submitted by some Montego Bay property owners "objects to the placement of 5G technology in their community" and "objects to the placement of cobra head lights of the size proposed, as they are inconsistent with the coach lights in front of each unit in the district, and to the placement of the facilities in any easement or property under the control of the community association."

85.     The Staff Report noted that the "facilities proposed are in public rights-of-way," not property under control of the community association.

86.     The Staff Report also noted that "the objection to 5G is not a valid basis for denying the applications."

87.     The Staff Report concluded that "applying just the Town Code and DAS design standards [Town Antenna Requirements], the applications should be denied, unless technology gardens are established at the proposed sites."

88.     The Staff Report stated, "based on its own review and the record, Staff believes the proposed structures and their placement are not aesthetically or architecturally compatible with the surrounding environment."  The Staff Report does not identify what provision of the Town Code or Town Antenna Requirements the staff relied on in coming to that conclusion.

89.     The Staff Report stated, "based on comments received, there does not appear to be a sound basis for establishing 'technology gardens' at the site of the proposed facilities."  The

Staff Report does not identify which comments it was referring to, or what provision of the Town Code or Town Antenna Requirements identify what is a "sound basis for establishing 'technology gardens'."

90.    The Staff Report stated that "staff does not believe that Crown Castle has demonstrated that denial will result in an 'effective prohibition' under applicable standards." The Staff Report does not identify what provision of the Town Code or Town Antenna Requirements require Crown Castle to demonstrate that a denial will result in an effective prohibition before the Town can approve a proposed facility.

91.    At the October 26, 2021 Mayor and City Council meeting, several residents of Montego Bay spoke in opposition.  During those comments, the residents presented the petition and an additional letter asking that Crown Castle "cease and desist the requests to place equipment in the Montego Bay community."

92.    The public comment in opposition was again focused on a generalized opposition to wireless technology, fear of RF emissions, a desire to preserve the status quo in the neighborhood, and confusion about what was being proposed.

93.    Crown Castle's proposal to construct the Three MH Nodes does not include removal of any existing lights in the Montego Bay Community.

94.    At the October 26, 2021 Mayor and City Council meeting, Crown Castle presented testimony and evidence demonstrating the need for wireless service in the vicinity of the Three MH Nodes, including wireless usage maps showing both demand for wireless services and a lack of availability of reliable wireless service in the subject area of Montego Bay.

95.     At the October 26, 2021 Mayor and City Council meeting, the City Engineer presented testimony regarding the history of Crown Castle's proposals to locate nodes in the Montego Bay area and the Staff Report on the Three MH Nodes.

96.     In response to a question from a City Councilmember, the City Engineer testified that there are no locations in the public right of way in Montego Bay in which Staff would support the location of a wireless facility.

97.     Also, at the October 26, 2021 Mayor and City Council Meeting, a Crown Castle representative presented testimony regarding the need for, and the designs and locations of, the Three MH Nodes, including evidence of a gap in in-building wireless signal in the area.

98.     After discussion of the applications, the Mayor and City Council made an oral motion to deny the Three MH Nodes based upon the findings and recommendations in the Staff Report.

99.     On November 1, 2021, the Mayor and City Council adopted a written decision denying the Three MH Nodes by unanimous vote.  That written decision is Resolution 2021-6 (the "Denial Resolution") and by its terms was adopted and effective upon passage on November 1, 2021.  *See* Exhibit 4.

100.     The Denial Resolution states in pertinent part, "after consideration of the record, including relevant information received on October 26, 2021, the Mayor and City Council hereby adopt the facts stated in the staff report, and for reasons stated in the staff recommendation, deny each of the applications for the placement of wireless facilities in the MH Zoning District."  *See* Exhibit 4.

101.     Pursuant to 47 U.S.C. § 332(c)(7)(B)(v), this Complaint is timely filed within thirty days of the Town's Denial Resolution.

## COUNT I
### Violation of 47 U.S.C. § 332(c)(7)(B)(iii) – Lack of Substantial Evidence

102.     Crown Castle incorporates herein by reference the allegations of paragraphs 1 through 101 above.

103.     Section 332(c)(7)(B)(iii) of the Communications Act provides that any decision by the Town "to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii).

104.     On March 30, 2021, August 6, 2021, and October 26, 2021, Crown Castle presented the Three MH Nodes to the Town seeking approval to install new personal wireless services facilities.

105.     Crown Castle presented testimony and evidence at the March 30th and October 26th Mayor and City Council meetings demonstrating that each of the Three MH Nodes would meet the Town requirements for deployment of personal wireless facilities.

106.     The public opposition to the Three MH Nodes, was not based on Crown Castle's failure to comply with any requirement in the Town Code or Town Antenna Requirements Town requirement.  Rather the public opposition was largely based on fear of RF emissions, confusion about the impact of the proposed Three MH Nodes, and general objection to 5G and wireless technology.

107.     By Resolution adopted and effective on November 1, 2021, the Town denied Crown Castle's applications for the Three MH Nodes.

108.     The Denial Resolution adopted the facts and reasons stated in the staff report presented at the October 26, 2021 Mayor and City Council meeting as the basis for denial of the Three MH Nodes.

109.    The reasons for denial in the Staff Report are not legitimate grounds for denial under the Town Antenna Requirements, the Town Code, or the UA Application requirements.

110.    Nothing in the CTC Report addresses or identifies any specific requirement established in the Town Antenna Requirements, the Town Code, or the UA Application, that Crown Castle failed to satisfy.

111.    Moreover, Crown Castle also presented substantial evidence that Crown Castle investigated thoroughly, including strategy sessions with the Town and the Montego Bay Homeowners Association to explore the possibility of other viable alternatives to the Three MH Nodes, but that no viable alternatives exist.

112.    There is no record evidence refuting Crown Castle's demonstration that it investigated thoroughly the possibility of other viable alternatives before concluding that no other feasible alternative was available.

113.    Accordingly, the Town's denial is not supported by substantial evidence in the written record, as required by 47 U.S.C. § 332(c)(7)(B)(iii).

114.    Consequently, the Town's action is in violation of, and preempted by, 47 U.S.C. § 332(c)(7)(B)(iii) and should be set aside and enjoined by the Court on that basis.  Further, this Court should exercise its power to issue an order directing the Town to approve the applications for the Three MH Nodes.

## COUNT II

### Violation of 47 U.S.C. §§ 253, 332(c)(7)(B)(i)(II) – Effective Prohibition

115.    Crown Castle incorporates herein by reference the allegations of paragraphs 1 through 114 above.

22

116.    Pursuant to 47 U.S.C. § 332(c)(7)(B)(i)(II), "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government of instrumentality thereof ... shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  47 U.S.C. § 332(c)(7)(B)(i)(II).

117.    Pursuant to 47 U.S.C. § 253(a), "[n]o state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

118.    In the *Declaratory Ruling*, the FCC issued a declaratory ruling that definitively interpreted the "effective prohibition" language of Sections 253(a) and 332(c)(7)(B)(i)(II), which the FCC explained must be interpreted and applied consistently.  The FCC declared that "an effective prohibition [of service] occurs where a state or local legal requirement ***materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service.***"  *Id.* ¶ 37 (emphasis added).  The FCC made clear that the Town effectively prohibits the provision of wireless services if it inhibits or limits Crown Castle "not only when filling a coverage gap ***but also when densifying a wireless network, introducing new services or otherwise improving service capabilities***."  *Id.* ¶ 37 (emphasis added).  The FCC also made clear that an effective prohibition includes inhibiting a provider from deploying the "performance characteristics" of its choosing.  *Id.* n.86.  The *Declaratory Ruling* also holds that local governments cannot deny an application for a wireless site based on the alleged existence of alternative locations.

119.    The *Declaratory Ruling* is currently in effect, and it governs Crown Castle's claim under 47 U.S.C. §§ 253(a) and 332(c)(7)(B)(i)(II).

120.     An effective prohibition claim does not interrogate the local decision making process, or depend upon the record before the local authority.  Rather an effective prohibition claim tests the impact of the denial of an application to install a personal wireless service facility.

121.     The Denial Resolution is expressly based on the Staff Report.

122.     The City Engineer authored the Staff Report.

123.     The City Engineer testified that there is no location in the MH Zone in the Montego Bay area for which Staff would recommend approval of a wireless facility.

124.     The Staff Report based its recommendation of denial on the fact that there are no aboveground utilities or light poles in the vicinity of the location proposed for the Three MH Nodes.

125.     Wireless facilities must be located above ground to function.

126.     Based on the Staff Report, and the Denial Resolution, there is no set of circumstances in which a wireless facility can be approved by the Town in the MH Zone in this area of Montego Bay.

127.     Crown Castle has identified specific areas within the Town in which it needs to install wireless facilities to provide telecommunications service to its wireless carrier-customers so that those customers can provide personal wireless telecommunications services to serve the residential areas of the Town.  Each Crown Castle Node has a small coverage area and is carefully located based upon Crown Castle's customers' specific technological and service needs.  The Town's denial of the Three MH Nodes materially inhibits Crown Castle from constructing its network in the Town and providing telecommunications service to its customers.

128.     In addition, Crown Castle's customers, who are providers of personal wireless services as defined by the Communications Act, have identified specific areas within the Town

24

in which they need to install wireless facilities to provide coverage, network capacity, and ultimately provide service. Each Crown Castle Node has a small coverage area and is carefully located based upon its customers' specific radio frequency needs. The Town's denial of the Three MH Nodes materially inhibits Crown Castle's customers' ability to fill gaps in coverage, densify their networks, introduce new services, and/or otherwise improve their service capabilities.

129.    In addition, or in the alternative, Crown Castle's wireless carrier-customers have a significant gap in personal wireless service in the areas surrounding the Three MH Nodes.

130.    There is no existing structure or property in the vicinity of the Three MH Nodes that is both reasonably available and technologically feasible to remedy the significant gap in personal wireless service in the area.

131.    There are no viable alternatives to the Three MH Nodes or less intrusive means of remedying Crown Castle's service gap in each area.

132.    The Town's denial materially inhibits and effectively prohibits Crown Castle from providing telecommunications services in the areas surrounding the Three MH Nodes.

133.    In addition, the Town's denial materially inhibits and effectively prohibits the provision of personal wireless service in the areas surrounding the Three MH Nodes.

134.    Consequently, the Town's denial is in violation of, and preempted by, Sections 253(a) and 332(c)(7)(B)(i)(II) of the Communications Act, and should be set aside and enjoined by the Court on that basis. Further, this Court should exercise its power to issue an order directing the Town to approve the Three MH Nodes.

## COUNT III

### Breach of Contract

135.     Crown Castle incorporates herein by reference the allegations of paragraphs 1 through 134 above.

136.     Section 4.2 of the Use Agreement states that "[w]here third-party property is not available for attachment of Equipment, Crown Castle may install its own poles in the Public Way, consistent with the requirements that the Town imposes on similar installations made by other utilities that use and occupy the Public Way."

137.     Crown Castle has demonstrated, and the City Engineer has recognized, that there is no third-party property available to use for Crown Castle's deployment of its wireless facilities in the vicinity of the Three MH Nodes.

138.     Section 6.1 of the Use Agreement provides that before beginning construction, Crown Castle must "first obtain the written approval from the Ocean City Mayor and City Council, *which approval shall not be unreasonably withheld, conditioned, or delayed.*" (emphasis added).

139.     Section 6.7 of the Use Agreement provides that the Town Public Works Director must provide approval, which "*shall not be unreasonably withheld, conditioned or delayed*," for Crown Castle to erect new poles. (emphasis added).

140.     Section 14.7 of the Use Agreement also limits the Town's ability to deny consent without a valid reason, stating "[i]n any case where the approval or consent of one party hereto is required, requested or otherwise to be given under this Use Agreement, such party shall not unreasonably delay, condition, or withhold its approval or consent."

141.     The Town's denial of the Three MH Nodes, without reason based in the Town Antenna Requirements, the Town Code, or UA Application requirements, and based apparently on public opposition to wireless installations, generally, is an unreasonable withholding of the

Town's consent to Crown Castle's applications to construct the Three MH Nodes in violation of Sections 6.1 and 14.7 of the Use Agreement.

142.    As such, the Town's denial is a breach of contract, pursuant to Md. Comm. L. Code § 22-701(a).

143.    This Court should exercise its power to issue an order directing the Town to approve the Three MH Nodes.

144.    Section 14.6 of the Use Agreement states "[s]hould any dispute arising out of this Use Agreement lead to litigation, the prevailing party shall be entitled to recover its costs of suit, including (without limitation) reasonable attorneys' fees."

145.    Therefore, Crown Castle is entitled to an award of reasonable attorneys' fees and costs as the prevailing party in this action.

**WHEREFORE, Plaintiff demands judgment in its favor and that this Court enter:**

(a)    An expedited review of the matters set forth in this Complaint pursuant to 47 U.S.C. § 332(c)(7)(B)(v);

(b)    A declaration and judgment that the Town's actions in refusing to approve Crown Castle's Three MH Nodes effectively prohibits Crown Castle from providing telecommunications service and is in violation of and preempted by 47 U.S.C. § 253(a);

(c)    A declaration and judgment that the Town's denial of the Three MH Nodes has the effect of prohibiting the provision of personal wireless service in violation of and preempted by 47 U.S.C. § 332(c)(7)(B)(i)(II);

(d)    A declaration and judgment that Town's denial of the Three MH Nodes is not supported by substantial evidence in the written record in violation of and preempted by 47 U.S.C. § 332(c)(7)(B)(iii);

(e)  An order holding that the Town's denial of the Three MH Nodes is in breach of the Use Agreement;

(f)  An order requiring the Town to grant Crown Castle's applications to install and operate the Three MH Nodes;

(g)  An order awarding Crown Castle its costs, reasonable attorneys' fees, and other expenses incurred in this action; and

(h)  Such other and further relief as the Court deems just and proper.

DATED this 1st day of December 2021

<div style="margin-left: 40%;">

*s/ Christen Lauren B'anca Glenn*
Thomas Scott Thompson (Pro Hac Vice Forthcoming)
Daniel R. Reing (Pro Hac Vice Forthcoming)
Christen Lauren B'anca Glen (MD D.Ct. No. 14945)
Avani Uppalapati (Pro Hac Vice Forthcoming)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C.
555 12th St. NW, Suite 1100
Washington, DC 20004
Tel: 202-434-7440
E-mail: CBGlenn@Mintz.com
         SThompson@Mintz.com

*Attorneys for Plaintiff*

</div>